IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 1, 2003

## STATE OF TENNESSEE v. RONALD PAXTON

**Appeal from the Criminal Court for Shelby County**
**No. 00-08753      Joseph B. Dailey, Judge**

---

**No. W2002-00268-CCA-R3-CD  - Filed June 20, 2003**

---

The defendant, Ronald Paxton, was convicted of second degree murder.  The trial court imposed a twenty-five year sentence.  In this appeal, the defendant argues that the evidence is insufficient to support his conviction and that the sentence is excessive.  The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID G. HAYES and THOMAS T. WOODALL, JJ., joined.

Tony N. Brayton (on appeal) and Teresa Jones (at trial), Assistant Public Defenders, for the appellant, Ronald Paxton.

Paul G. Summers, Attorney General & Reporter; P. Robin Dixon, Jr., Assistant Attorney General; and Gerald Harris and Jennifer Nichols, Assistant District Attorneys General, for the appellee, the State of Tennessee.

## OPINION

On January 26, 2000,  the defendant's ex-girlfriend, Angela Housley, was shot and killed at her residence in Memphis.  On the following morning, Raheema Abdullah, the victim's mother, received a telephone call from the victim's place of employment when the victim failed to report to work.  Ms. Abdullah traveled to the victim's residence and looked in the window but did not see anyone inside.  After telephoning the victim's place of employment and learning that she still had not arrived for work, Ms. Abdullah returned to the residence, concluded that it was empty, and drove to the school to talk with the victim's two minor daughters.  After speaking with the victim's oldest daughter, Ashley, Ms. Abdullah asked her son-in-law, Reginald Mitchell, to accompany her to the victim's residence.  Although it was January, the air conditioner was on.  Mitchell and Ms. Abdullah broke through the back door and found the victim lying in a pool of blood near her bed.  When he was unable to detect a pulse, Mitchell telephoned 911.  While attending to the victim, Mitchell discovered a small hole in the victim's back which had been covered with tape.  Mitchell described

the condition of the victim's residence as "junky," with beer cans strewn throughout the house and blood on the floor. The battery had been removed from the cordless phone.

At trial, Ashley Housley, the victim's oldest daughter, who lived in the residence with the victim and her younger sister, Jasmine, testified that the defendant had stopped by to visit on the evening before the body was discovered. She recalled that shortly after the defendant arrived, she and her sister went into another part of the house to do their homework. When she heard pans hitting the kitchen floor and heard the victim scream out her name, Ashley walked to the kitchen and saw the defendant holding the victim by her arms. She testified that when the victim directed her to "[g]o get a bat and bust the window so you can get some help," the defendant ordered her and her sister to their bedroom. Ashley recalled that she heard the victim and the defendant continue to argue and that later, she returned to the kitchen and found the defendant sitting alone. The defendant told her that the victim was asleep in the bedroom. After returning to her room, Ashley heard a gunshot. Afterward, when one of the victim's friends knocked on the door, the defendant entered the girls' room and told them to be quiet. On the following morning, the defendant informed the girls that their mother had already gone to work and then drove them to school.

Jasmine Housley, the victim's younger daughter, also testified at trial, corroborating her sister's testimony. She recalled that the victim and the defendant argued on the night of the shooting and she saw the defendant hold the victim against the door with a gun in his hand. Jasmine stated that the victim was crying. She remembered that later, when the defendant gave her and her sister a glass of water, her mother was no longer in the kitchen. She confirmed that her mother asked her to get the bat from underneath her bed, break out a window, and go for help. Jasmine testified that she was afraid to do so.

Officer Joe Paige of the Memphis Police Department Crime Scene Bureau discovered dried blood outside on the carport and throughout the interior of the residence. He stated that both the den and the victim's bedroom appeared to have been "ransacked" and that there were signs that a struggle had taken place.

Officer Sherman Bonds discovered a .32 caliber bullet fragment, which was recovered from the west wall of the victim's den by the medical examiner, Dr. O'Brien Cleary Smith. Officer Bonds also found a small shell casing located on the breakfast bar adjacent to the den. Two pieces of the victim's fingernail were located in front of the television set in the den. Some of her hair was located in the middle of the den floor near the fireplace. There was broken glass inside the door leading from the carport into the house.

Sergeant Daniel Barham, who assisted in the investigation, found the victim's vehicle at a residence owned by Wanda Kerns. After Ms. Kerns consented to a search of the premises, officers discovered a .32 caliber revolver on top of the refrigerator. According to Officer Kant, who recovered the weapon, it contained three live rounds.

At trial, Frederick Parchman, a friend of the victim, testified that in May of 1999, the victim purchased a firearm at a Memphis pawn shop.

After being advised of his <u>Miranda</u> rights, the defendant admitted to Officer James L. Fitzpatrick that he had shot the victim in the back and in the arm. He explained that although the victim's children were in the house when the shooting took place, they were in a different room and did not witness the shooting. The defendant stated that he had gone to visit the victim, with whom he had a long-term romantic relationship, to bring gifts to her and her children. The defendant claimed that the victim became angry when he walked toward her bedroom and "pulled the gun out and told me to get out of her bedroom." In response, he took the gun away from her, struck her with it on the top and side of her head, and then shot her. According to the defendant, after the victim was shot, "she was moving and crawling on the den floor and eventually went to the bedroom." He claimed that he "took some tape and wrapped [it] around her back trying to stop the bleeding." He stated that he made three trips into the bathroom in an attempt to find medical supplies before the victim died. The defendant explained that he did not call 911 because he was busy trying to stop the bleeding on his own. The defendant told police that he "moved the body to the side of the bed, so the kids wouldn't see." The next morning, he prepared breakfast for the girls, told them that he had taken the victim to work, and drove them to school.

Officer George Jackson testified that he had responded to a burglary call at the victim's residence several months before the murder. He recalled that the glass had been removed from a window in the rear of the victim's residence. Inside, there were shredded photographs of the victim and her ex-husband on the dining table along with a paper sack containing hair clippers, bar soap, and other personal items. After speaking with the victim, police developed the defendant as the primary suspect in the burglary. Lieutenant Mary Newsom, who investigated the victim's burglary complaint, testified that the victim had claimed that the defendant had telephoned her repeatedly, threatening to kill her. Lieutenant Newsom listened to threatening messages the defendant had left on the victim's voice mail.

Dr. Smith performed an autopsy. There were two gunshot wounds, one which traveled through the soft tissue of the victim's upper left arm and another that entered her back and lodged inside her abdominal cavity. Dr. Smith identified the bullet discovered in the wall as the one which passed through the victim's arm. The victim had two tear wounds to her scalp, most likely caused by the muzzle end of the weapon used to shoot the victim. There were defensive wounds on the victim's hands and a number of bruises and lacerations to other parts of her body.

Dr. Smith found an accumulation of approximately one quart of blood inside the chest and abdominal cavities. The bullet that penetrated the victim's back traveled through the left lower lobe of the lung, the diaphragm, the spleen, the pancreas, the stomach, and the kidney before lodging in the surface of the skin. Because there was no evidence of powder burns, Dr. Smith determined that the gunshot to the victim's back was fired from a distance of greater than two feet. It was his

-3-

opinion that with immediate medical attention, the victim would have had a very high chance of survival. Dr. Smith explained that although the gunshot wound to the back alone was significant enough to cause death, it was his opinion that death was the result of multiple injuries.

At trial, the defendant testified that he became romantically involved with the victim in 1997 and moved into her residence several months later. While acknowledging that he moved out in April of 1999 at the victim's request, the defendant claimed that he continued to date the victim and talked with her on a daily basis. He admitted that he entered the victim's residence without her consent in May of 1999 but claimed he did so to recover some personal items he had left behind a month earlier. He also admitted "balling up" the photographs of the victim and her ex-husband but denied shredding them. The defendant testified that he attended a number of family functions with the victim after the May incident. He stated that they quit dating completely in November but had spoken by telephone twice in December.

The defendant claimed that the victim reacted positively when he arrived unexpectedly on the night of the shooting and that she prepared dinner for him. He testified that they engaged in pleasant conversation until he attempted to go into her bedroom. The defendant stated that the victim angrily ordered him not to go into her bedroom. When he refused to stop, the victim "reached behind a picture on the mantelpiece and pulled out a gun." The defendant then explained that after he took the gun from the victim, she struck him with her hands and with a pot she had taken from a cabinet. The defendant admitted that he then struck the victim twice in the head with the gun. He claimed that as the victim fell to the ground, she grabbed his legs. He testified that he then "shot on the side of her real quickly to try to scare her, and she jumped, and I tried to shoot her on the other side, too. And as I got ready to shoot on this side, she went in the direction where I shot at, and . . . the bullet hit her." The defendant admitted that he intended to fire the gun but claimed that he was not trying to shoot the victim.

The defendant recalled telling the victim to sit on the fireplace while he went into the bathroom and returned with medical tape, which he "wrapped . . . around the wound on her back." He stated that the tape would not adhere to the victim's back because the bleeding was profuse. He explained that he did not summon medical attention because he did not believe the wound was life threatening and because he feared no one would believe the shooting was an accident. According to the defendant, he went into the bathroom to get more medical tape, and, upon his return, found that the victim had moved from the den into her bedroom. He testified that she lost consciousness approximately twenty to twenty-five minutes after she was shot and died shortly thereafter.

The defendant claimed that he did not try to conceal his crime but instead tried to protect the victim's children. He explained that he planned to shoot himself after taking the girls to school. Instead, however, he drove to a friend's house, where he exchanged a day's use of the victim's vehicle for some marijuana. He was arrested several hours later.

# I

Initially, the defendant challenges the sufficiency of the evidence. He claims that because he and the victim were engaged in "mutual combat" when he shot her, he should have been convicted of voluntary manslaughter rather than second degree murder.

On appeal, of course, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact. Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas v. State, 199 Tenn. 298, 286 S.W.2d 856, 859 (1956). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

Second degree murder is "a knowing killing of another." Tenn. Code Ann. § 39-13-210(a). Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a). Both offenses require at least a knowing mental state.

Here, there was evidence that the defendant, who had been arrested for burglarizing the victim's residence only months earlier, arrived at the victim's residence unexpectedly. They argued vehemently prior to the shooting. The victim's daughters recalled hearing pots and pans being thrown in the kitchen and saw the defendant "pin" the victim against a door. While claiming that the shooting was accidental, the defendant acknowledged that he did not seek medical treatment for the victim. After shooting the victim, he remained at her residence overnight and then drove her children to school the following morning, explaining that he had already driven their mother to work. The victim's body was concealed in the bedroom. The jury accredited the testimony of the witnesses for the state and rejected the defendant's theory that he killed the victim either accidentally or after adequate provocation. That was the prerogative of the jury. In our view, the evidence was sufficient to support the conviction.

## II

The defendant also asserts that his sentence is excessive, complaining the trial court erred by the application of statutory enhancement factors (5), (19), and (22),[1] see Tenn. Code Ann. § 40-35-114 (1997 & Supp. 2000), and by utilizing two non-statutory enhancement factors to increase his sentence. The state submits that the trial court properly applied enhancement factors (5) and (22) and that the trial court did not rely on any non-statutory enhancement factors.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597, 600 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

In calculating the sentence for a Class A felony conviction, the presumptive sentence is the midpoint within the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). If there are enhancement factors but no mitigating factors, the trial court shall set the sentence at or above the midpoint. Tenn. Code Ann. § 40-35-210(d). If there are mitigating factors but no enhancement factors, the trial court shall set the sentence at or below the midpoint. Id. A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. § 40-35-210(e). The sentence must then be reduced within the range by any weight assigned to the mitigating factors present. Id.

In arriving at a sentence of twenty-five years, the maximum within the range, the trial court applied the following enhancement factors:

---

[1]Effective July 4, 2002, the legislature has amended Tenn. Code Ann. § 40-35-114 by renumbering original enhancement factors (1) thru (20) and including as enhancement factor (1) that "the offense was an act of terrorism, or was related to an act of terrorism."

(1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;

(5) The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense;

(9) The defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense;

(11) The felony resulted in death or bodily injury or involved the threat of death or bodily injury to another and the defendant has previously been convicted of a felony that resulted in death or bodily injury;

(19) The lack of immediate medical treatment would have probably resulted in the death of the victim under section 39-15-402; and

(22) The defendant intentionally selected the person against whom the crime was committed or selected the property that was damaged or otherwise affected by the crime in whole or in part because of his belief or perception regarding the race, religion, color, disability, sexual orientation, national origin, ancestry or gender of that person or of the owner or occupant of that property.

Tenn. Code Ann. § 40-35-114 (1997 & Supp. 2000). The trial court relied on the defendant's education, employment history, and family ties as mitigation evidence. See Tenn. Code Ann. § 40-35-113(13).

The defendant contends that enhancement factor (5), that the victim was treated with exceptional cruelty, is not supported by the record. Application of this factor requires a finding of cruelty over and above that inherently attendant to the crime for which the defendant is convicted. State v. Embry, 915 S.W.2d 451, 456 (Tenn. Crim. App. 1995). In other words, such evidence must "denote[] the infliction of pain or suffering for its own sake or from the gratification derived therefrom, and not merely pain or suffering inflicted as the means of accomplishing the crime charged." State v. Kelly Haynes, No. W1999-01485-CCA-R3-CD (Tenn. Crim. App., at Jackson, Mar. 14, 2000). Enhancement factor (5) has typically been applied in situations where the victim was tortured or abused. See State v. Davis, 825 S.W.2d 109, 113 (Tenn. Crim. App. 1991). This court has upheld the application of this factor based on proof of extensive physical abuse or torture, see State v. Williams, 920 S.W.2d 247, 259 (Tenn. Crim. App. 1995), as well as proof of psychological abuse or torture, see State v. Thomas Lebron Mills and Carl Franklin Mills, No. 936 (Tenn. Crim. App., at Knoxville, Dec. 19, 1985) (holding that acts of mental cruelty, by themselves, can be as vicious and scarring as acts of physical cruelty).

Here, the trial court applied this factor based upon the defendant's actions after shooting the victim. The defendant chose not to summon medical help, concealed the crime from the victim's daughters overnight, and, on the following morning, drove the children to school as if nothing had happened. Although she was shot twice, the proof established that the victim could have survived the gunshot wound to the back had she received immediate medical attention. In fact, Dr. Smith testified that her chances for survival were favorable for as long as twenty minutes after the shooting. The defendant allowed her to bleed to death. In addition, the defendant admitted striking the victim

twice with the gun before shooting her. The victim suffered bruises and abrasions and had several defensive wounds as a result of the attack. It is our view that the defendant demonstrated a culpability greater than that necessary to commit the crime itself. The trial court did not err by applying this factor.

The defendant next contends that the trial court erred by applying enhancement factor (19), that the lack of medical treatment would have probably resulted in the death of the victim under Tennessee Code Annotated section 39-15-402. The state concedes that the trial court erred by applying this factor. The plain language of section 40-35-114(19) requires that the underlying offenses be a violation of section 39-15-402, which prohibits aggravated child abuse and neglect. For this reason, enhancement factor (19) is inapplicable.

The defendant asserts that enhancement factor (22), that he intentionally selected the victim based upon her race, religion, color, disability, sexual orientation, national origin, ancestry, or gender, is inapplicable. The state argues that this factor should be applied because the defendant chose to kill the victim knowing that she was the mother of two minor children. There was no proof that the defendant selected the victim based upon any of the enumerated above criteria. To the contrary, the evidence at trial and at the sentencing hearing established that the victim's death was most likely the result of her desire to end an amorous relationship with the defendant. Little suggests that the defendant acted out of anything other than jealousy. In consequence, enhancement factor (22) would not be applicable.

Finally, the defendant claims that the trial court improperly increased his sentence based upon the finding of two non-statutory enhancement factors. He contends that the trial court applied as enhancement factors the victim impact testimony and his lack of remorse. Although the trial court observed that it had considered the victim impact testimony and the defendant's lack of remorse, nothing in the record suggests that the trial court relied on those to enhance the length of the sentence. This issue is without merit.

The trial court did misapply enhancement factors (19) and (22); however, enhancement factors (1), (5), (9), and (11) were properly applied and are entitled to considerable weight. The mitigating factors cited by the trial court were of little significance. Under these circumstances, the twenty-five year sentence, the maximum within the range, was warranted.

Accordingly, the judgment of the trial court is affirmed.

_____
GARY R. WADE, PRESIDING JUDGE